# 23-7769

In the

# United States Court of Appeals

## For the Second Circuit

GREGORY MCGOWAN, on behalf of themselves and others similarly situated,
ROBERT W. BRUDERMAN, on behalf of themselves and others similarly situated,
The JOHN W. TEMPLE REVOCABLE TRUST, on behalf of themselves and
others similarly situated and THE MORRISON FAMILY TRUST,
on behalf of themselves and others similarly situated,

*Plaintiffs-Appellants,*

– v. –

GEOFF STANLEY, DOUGLAS MEADOW, RUBY HOLLOW LLC
and JOHN DOES 1 through 10,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFFS-APPELLANTS

A. M. RICHARDSON, P.C.
*Attorneys for Plaintiffs-Appellants*
40 Wall Street, 35th Floor
New York, New York 10005
(212) 530-4771

TABLE OF CONTENTS

INTRODUCTION                                                          1

JURISDICTIONAL STATEMENT                                             2

ISSUES PRESENTED                                                     2

STATEMENT OF THE CASE                                               2

STATEMENT OF FACTS                                                  14

SUMMARY OF ARGUMENT                                                30

ARGUMENT                                                            31

**I.  The Plaintiffs' Evidence Showed That the Defendants Did Not
Pay for the Stock They Claimed to Own.**                            31

**II.  The Plaintiffs' Evidence Shows That the Defendants Did Not
Pay for the Debt They Claimed to Own.**                             35

**III.  The Plaintiffs' Evidence Showed That the Defendants Defrauded
Chief's Shareholders.**                                             37

    **A.  Corporate Opportunity and Breach of Fiduciary Duty**     38

    **B.  Conversion and Misappropriation**                         42

    **C.  False and Misleading Financial Statements**               43

**IV.  The Plaintiffs' Damages Can Be Easily Calculated.**          46

**V.  Summary Judgment Should Not Have Been Granted to the
Defendants.**                                                       47

CONCLUSION                                                          48

CERTIFICATE OF COMPLIANCE                                           49

TABLE OF AUTHORITIES

Cases

*Abraham v. Emerson Radio Corp.,* 901 A.2d 751, 759 (Del. Ch. 2006)        38

*Amerco v. Schoen,* 907 P.2d 536, 542 (Ariz. Ct. App. 1995)        46

*Atkinson v. Marquart*, 112 Ariz. 304, 541 P.2d 556 (Ariz. 1975)        40

*Gallo v. Prudential Residential Services Ltd. Partnership,*
22 F.3d 2219, 2223-4        47

*Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970).        8

*Guth v. Loft, Inc*., 23 Del.Ch. 255, 5 A.2d 503 (Del. 1939        38, 39, 42

*Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 412 P.2d 47,
(Ariz. 1966)        39

*Washington Nat. Trust Co. v. W. M. Dary Co*., 16 Ariz. 171,
568 P.2d 1069, 1 (Ariz. 1977).        39, 42

Statutes

Securities Act of 1933 (15 U.S.C. 77a et seq.)        43, 44

Securities Exchange Act of 1934, Section 12(g) (15 U.S.C. 78a et seq)        44

Securities Exchange Act of 1934, Section 15(d) (15 U.S.C. 78a et seq)        3, 44

28 U.S.C. §1291        2

28 U.S.C. §1331        2

28 U.S.C. §1332        2

Regulations

Regulation S-X (under the Securities Exchange Act of 1934)        3, 44

Rules

Federal Rules of Civil Procedure – Rule 26                                  2, 5

Federal Rules of Civil Procedure -- Rule 26(a)(1)(A)(ii)          5, 7

Federal Rules of Civil Procedure -- Rule 26(b)(5)                      8

Federal Rules of Civil Procedure -- 26(c)(1)(G)                          7

Federal Rules of Civil Procedure – 56(d)                              48

Federal Rules of Evidence – Rule 401                                    31

Federal Rules of Evidence – Rule 402                                    31

## INTRODUCTION

In its Decision and Order of October 12, 2023, the District Court wrote:

"The plaintiffs … have not offered admissible evidence sufficient to defeat the defendants' motion or to support their own motion."

The Plaintiffs' evidence consisted of corporate documents, bank records, defendants' admissions, written communications, public statements, and first-hand witness statements. The Plaintiffs' evidence tended to make facts in issue more or less probable, specifically that the Defendants did not pay for the interests they claimed to own. The evidence was relevant and admissible. The Defendants' response was like the Wizard of Oz saying, "pay no attention to the man behind the curtain." The District Court's Decision and Order contains no reference to any of the Plaintiffs' evidence, arguments, or authorities.

The Defendants' evidence consisted of quotations of the Plaintiffs who, as investors, truthfully stated that they did not personally witness the self-dealing transactions, conducted in secret, that the Defendants were legally required to disclose to their shareholders -- but did not. The Plaintiffs statements were essentially irrelevant and inadmissible except insofar as they confirm Defendants' non-disclosure.

The District Court also stated:

"The plaintiffs largely declined to participate in discovery …"

The Plaintiffs timely made Rule 26 disclosures, supplied all documents requested, answered interrogatories, and appeared at three depositions. The Defendants did not make any Rule 26 disclosures with respect to documents, objected to every document request, and avoided any depositions.

## JURISDICTIONAL STATEMENT

The District Court's jurisdiction in the underlying actions arises under 28 U.S.C. §1331 and §1332. This Court's jurisdiction on this appeal exists under 28 U.S.C. §1291. The appeal is from Decision and Order dated October 12, 2023. Notice of appeal was timely filed on November 9, 2023.

## ISSUES PRESENTED

Did the District Court err in granting summary judgment to the Defendants and denying partial summary judgment to the Plaintiffs.

## STATEMENT OF THE CASE

In June 2018, the Defendant Ruby Hollow LLC, managed by the individual Defendants, Geoff Stanley and Douglas Meadow, contracted to acquire: (a) for $2,500,000 an 83.5% interest in the stock, and (b) for $2,000,000 secured and unsecured debt in the principal amount of $3,552,475 (about $4.5 million with interest), of Chief Consolidated Mining Company ("Chief"), a publicly owned Arizona corporation engaged in mining in Utah, from LeadFX Inc., a Canadian

corporation ("LeadFX"). As a company registered under Section 15(d) of the Securities Exchange Act of 1934, Chief was required to maintain and publish financial statements according to Regulation S-X. According to the unaudited financial statements for Chief before being taken over by the Defendants, and according to the last filed public report, Chief had a paid in capital of more than $40 million.

The evidence indicates that Ruby Hollow paid at most a small fraction of the amounts due LeadFX. Instead, the Defendants looted the entire, or nearly the entire, purchase price from Chief to the detriment of the "minority" shareholders, the more than one thousand other shareholders who did pay for their interests. The monies and assets of Chief looted by the Defendants were not taken from Chief for any valid corporate purpose, but rather for the personal enrichment of the Defendants and to pay the Defendants' own obligations.

Chief's cash came from a joint venture, Tintic Consolidated Mining, to which Chief in 2019 transferred its mining rights and some of its acreage in exchange for $3.5 million and a 49% interest in the joint venture. Additional funds came from mortgaging Chief's assets to raise money to pay Ruby Hollows obligations.

The use of Chief assets and cash to fund Defendants' purported purchases of Chief stock and debt was a seizure of Chief corporate opportunities. If accounted

for properly, this should have resulted in a non pro rata redemption of the 83.5% share interest, rightfully converting that interest to Chief treasury stock, and to the total elimination of all Chief debt.

The Defendants' looting left Chief without the resources to participate fully in a TCM, resulting in substantial dilution of Chief's interest in that venture, from 49% to 25%, to the further detriment of Chief's other shareholders.

In 2020, if not before, Chief's joint venture partner, I. G. Tintic, which had undertaken all the mining work, discovered a "bonanza level" of gold. In 2021, with full knowledge of the gold strike, the Defendants caused Chief to issue more than an additional five million shares of stock to themselves, other members of Ruby Hollow, and Chief's corporate secretary, for either $.01 per share or $.10 per share. At the same time, the Defendants were offering Chief shares for $.50 per share. The stock issuance was not disclosed to Chief's shareholders as required by Regulation SX.

In 2022, the Defendants arranged a transaction whereby Chief's non-mining assets were spun off to a new entity known as Emerald Hollow, and Chief and the mining assets were sold to Osisko Development Corp., a public entity, for approximately $60,000,000, resulting in a huge unearned windfall to the defendants of more than $50,000,000 that rightfully belongs in substantial part, if not all, to Chief's other shareholders.

The complaint was filed on August 17, 2022. The Defendants included Geoff Stanley, Douglas Meadow, Ruby Hollow LLC, and John Does 1 through 10, who were intended to be the persons later identified who participated with the named Defendants in the alleged scheme to take control of and loot Chief. At all relevant times during the events described in the Complaint, the headquarters of Ruby Hollow were Meadow's apartment in New York City, and the headquarters of Chief were Stanley's apartment in New York City.

The Defendants in their Answer (JA – 163) denied almost everything, but did admit, in paragraph 27, that Chief paid the overdue property taxes, and in paragraph 28, that Chief paid for the increase in a reclamation bond that was a portion of the purchase price to be paid by Ruby Hollow under the Debt Assignment Agreement (JA - 86).

A schedule for the case was set after the Rule 16 conference on November 17, 2022. The parties made Rule 26 exchanges on December 8 and 9, 2022. The Defendants' response for Rule 26(a)(1)(A)(ii) was: "At the current time, the defendants are compiling documents and conferring with Plaintiffs' counsel regarding agreeing to a Protective Order." It was unclear why Defendants could not at least identify categories of documents. Plaintiffs asked what Defendants considered "confidential" since Plaintiffs were not seeking any trade secret or private information. Defendants refused to be explicit. Defendants later claimed

that Chief, albeit registered with the Securities and Exchange Commission, and with 1000 shareholders, was a "private company."

The Plaintiffs moved to disqualify Defendants' Utah counsel, which had represented Chief even before the Defendants' takeover, because it had appeared to be the "dog that did not bark" and possibly complicit with the Defendants' takeover. Plaintiffs contended that the counsel should be witnesses, or otherwise they would seek to conceal information to which shareholders should be entitled. The District Court denied the motion. What the Plaintiffs feared was exactly what occurred.

When the Defendants were served with a 44-item request for production, they denied every request (JA - 318). They did however admit, with respect to Request 9 and 10, that Ruby Hollow did not assume any obligations to Chief Third-Party Creditors, as required by Paragraph 2.4(b) of the Share Sale Agreement (JA - 34). Indeed, for example, Chief paid a property tax bill of $360,451.10 that Ruby Hollow had agreed to pay (Exhibit #7 to Docket Item 74).

The Defendants had a variety of reasons non-compliance with the requests for production. One response was that a request was not "proportionate." But the Defendants did not provide documents that they did think were proportionate. They claimed that documents from the Defendants themselves were "irrelevant."

Another reason was that the Defendants had prepared preliminary disclosure that would answer several items, and that the preliminary disclosures would be made subject to a confidentiality order.  Plaintiffs thought the definition of "confidential" in the Defendants' form of agreement was overly broad.  Plaintiffs had not sought any confidential information.  Encouraged by the Court, Plaintiffs agreed to Defendants' forms as it said the burden of proof as to confidentiality lay with the producing party. (JA – 336)

When the Defendants finally made their initial disclosures, the package was far from complete.  The disclosures only went up to mid-2020 and did not contain any documents from the Defendants themselves, which one might have expected from Rule 26(a)(1)(a)(ii).  There was a dearth of financial information provided, no shareholder information relating to share ownership, which Defendants claimed not to have, and no communications to shareholders.

Many of the documents labeled confidential were a matter of public record, such as filings with the Utah Department of Oil, Gas & Minerals or past bankruptcy proceedings, neither of which are relevant to this case.  Some documents marked "confidential" were already exhibits in this case to which there had been no objection.  There was nothing meeting the standard of FRCP 26(c)(1)(G) as a trade secret or other research, development, or commercial

information, nor was any personal information included save for inadvertently included social security numbers, which Plaintiffs redacted.

Plaintiffs objected to the confidentiality designations, and the Defendants conceded some of the objections. The Defendants did not move for a protective order with respect to the rest. When Plaintiffs demanded that they do so, Defendants responded by attacking Plaintiffs for resisting discovery.

The Defendants have refused to provide any information about payments or arrangements for legal services, claiming it to be privileged. No privilege list has been provided per Rule 26(b)(5). Under the widely followed doctrine of *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), shareholders may have access to privileged communications relating to the corporation in which they hold shares.

Among the most significant information are of copies of instructions for wire transfers from Chief to members of Rudy Hollow (Exhibit #9 to Docket Item 74). There was no corporate authorization or corporate purpose disclosed for these transfers. They were related party transactions, and of interest to the Chief shareholders. The funds came from Chief's mining joint venture, as part of the payment for Chief's transfer of land and mineral rights to the joint venture. Instead of being used for the mining joint venture, the funds in the amount of $942,000 were almost immediately disbursed to members of Ruby Hollow and its counsel.

8

The transfers are summarized as follows:

| Name/Entity | Relationship | Amount |
|---|---|---|
| Christopher Jordan | Member, Ruby Hollow | $115,000 |
| Douglas Meadow | Manager and Member, Ruby Hollow, Chief President and Board Member | $143,750 |
| Geoff Stanley [Korein – spouse; Premium CBD Labs] | Manager and Member, Ruby Hollow, Chief CEO and Board Member | $138,000 |
| Tom Roth [RA Utah LLC] | Member, Ruby Hollow | $146,500 |
| McDonald Field | Counsel, Ruby Hollow | $5,000 |
| James Sprayregen [Utah Investment LLC] | Member, Ruby Hollow | $148,750 |
| Parr Brown Gee & Loveless | Counsel, Chief and Ruby Hollow | $245,000 |

The total of these payments is $942,000. The Defendants have not supplied any corporate authorization for these payments. The Defendants have not offered any explanation for the payments. They appear to be disguised as "consultant fees" and "directors' fees" in the financial statements provided to Chief shareholders.

The firm of Parr, Brown, Gee & Loveless, also received checks in 2019 totaling $84,500.95. (Exhibit #12 to Docket Item 74). The Chief financial statements provided to shareholders showed legal fees of $111,861. (JA - 368). The inference is that the payments, which clearly occurred, were for something other than legal fees for Chief, such as financing for the Defendants' takeover of Chief.

After the initial disclosures, the Defendants supplied unsigned copies of minutes of meetings of shareholders and directors. The minutes of the meetings of directors indicated that in April and September 2021 (see Exhibits ##15 and 16 to Docket Item 74), several months after vast amounts of gold had been discovered by the mining joint venture, the directors (consisting of Stanley, Meadows, and another member of Ruby Hollow, Eric Hinton) issued the following Chief shares to themselves as compensation for services at a valuation of $.01 per share in April and $.10 per share in September.

list of persons receiving stock grants in April 2021 is similar to the list of persons receiving payments in June 2019.

Stock Grants at $.01 per share in April 2021:

| Individual | Relationship | Amount |
|---|---|---|
| Geoff Stanley | Manager and Member, Ruby Hollow, Chief CEO and Director | 1,000,000 |
| Douglas Meadow | Manager and Member, Ruby Hollow, Chief President and Board Member | 1,000,000 |

10

| Timothy Buchanan | Indirect Member, Ruby Hollow, Secretary | 1,000,000 |
| Eric Hinton | Member, Ruby Hollow, Chief Board Member, Mining Consultant | 250,000 |
| Tom Roth | Member, Ruby Hollow, Real Estate Consultant | 50,000 |
| Christopher Jordan | Member, Ruby Hollow, Technical Consultant | 50,000 |
| Jamie Sprayregen | Member, Ruby Hollow, legal and corporate consultant | 50,000 |

Stock Grants at $.10 per share in September 2021:

| Individual | Relationship | Amount |
| --- | --- | --- |
| Geoff Stanley | Manager and Member, Ruby Hollow, Chief Director and CEO | 500,000 |
| Douglas Meadow | Manager and Member, Ruby Hollow, Chief Director and President | 500,000 |
| Timothy Buchanan | Indirect Member of Ruby Hollow, Secretary | 500,000 |
| Eric Hinton | Member, Ruby Hollow, Chief Director, mining consultant | 125,000 |
| Tom Roth | Member, Ruby Hollow, real estate consultant | 25,000 |
| Christopher Jordan | Member, Ruby Hollow, technical consultant | 25,000 |
| Jamie Sprayregen | Member, Ruby Hollow, legal and corporate consultant | 25,000 |
| Curtis Clarke | "Independent" Chief Director, mining consultant | 125,000 |
| Todd Maynes | Legal and Corporate consultant | 25,000 |

11

At a prior meeting on March 3, 2021 (Exhibit #17 to Docket Item 74), the directors had determined that the fair market value was $.50 per share, or fifty times the price at which they were issuing the shares to themselves. Less than a year later, these shares would become valued at $.57 in connection with the purchase of the mining joint venture by Osisko Development.

The issuance of these shares to related parties was not disclosed to Chief shareholders. Nor was it disclosed in the Certification of Timothy Buchanan presented to the District Court on May 2, 2023, at a time when Buchanan himself considered himself an owner of 1,500,000 Chief shares.

The disclosures to Chief shareholders also did not include that Ruby Hollow had purportedly converted Chief debt (that it had not paid for) into Chief shares at the conversion price of $.10 per share. This meant that Ruby Hollow quintupled its "investment" in the Chief debt for which it never paid.

The conversion of debt to stock was disclosed by Ruby Hollow's managers to its members in April 2021. It was not disclosed to the Plaintiffs by the Defendants, but rather by a former member of Ruby Hollow under no confidentiality restrictions. (JA – 422). The conversion was supposedly done according to the terms of a "note" that has never been disclosed or fully described by the Defendants, and for which the Defendants have never provided any corporate authorization.

These additional undisclosed stock issuances, for which Ruby Hollow and its members and associates did not pay, added more than 27 million shares to the total purportedly owned by Ruby Hollow and its associates, raising its percentage ownership to roughly 89%.

On May 17, 2023, the District Court denied class certification in part because the Defendants claimed that the proposed class, Chief shareholders other than Ruby Hollow, included the Defendants and members of Ruby Hollow. The issuance of more than 5 million shares of stock to the Defendants and members of Ruby Hollow had not been disclosed to Chief's shareholders. Nor did the Defendants disclose the clandestine issuance of "cheap stock" in opposing the class certification.

In a Declaration dated August 31, 2020, in another action (JA - 382), Defendant Stanley claimed that the Debt Assignment Agreement (Exhibit B to Complaint) had been amended to permit Ruby Hollow to acquire $4.5 from LeadFX $4.5 million of Chief debt for $1.00, essentially for nothing.

> "28. The revisions to the Debt Assignment Agreement were memorialized in a Letter Agreement dated November 30, 2018. Neither CCMC [Chief] nor Ropes was a party to the Letter Agreement."

The Defendants supplied a copy of this purported amendment (Exhibit #20 to Docket Item 74) It is not signed by either LeadFX or Chief, both parties to the Debt Assignment Agreement (JA – 86), who, according to the terms of the

Agreement, would have to have formally agreed to its amendment. Nor was the amendment ever authorized by any corporate action on the part of Chief.

The payment for the LeadFX Debt had two parts – paying for the reclamation bond increase, which Chief paid, and paying the balance of $1,640,000. As shown by the emails (JA – 468)), the Defendants redirected $1.8 million owed by the Mining Joint Venture to Chief to Ruby Hollow. In other words, Chief paid the entire purchase price for the LeadFX Debt, which then should have been retired. Instead, it was used by Ruby Hollow to siphon additional funds from Chief and increase Ruby Hollow's share ownership in Chief by nearly 36 percent. There is no evidence that Ruby Hollow paid for the LeadFX Debt. There is not even any evidence that Ruby Hollow paid the $1.00.

## STATEMENT OF FACTS

Chief was a 100+ year old mining company with substantially all its assets located within the historic Tintic Mining District located in central Utah. Chief's assets, which had lain dormant for decades, included 14,000 contiguous acres, the vast majority of which consisted of both surface and minerals, including over 900 individual patented mining claims. (JA – 17))

According to Tom Bowens, President of I.G. Tintic, Chief's joint venture partner:

"At the time my company IG Tintic, LLC entered into this transaction with Chief to form TCM in February 2019, TCM began with nearly 14,000 acres of minerals, 7,000 acres of surface, over $200 Million in legacy Capital Expenses in the form of at least 6 existing mine shafts over 30 miles of underground workings and 2 fully permitted mines, as well as data from over 200 past drill holes and over 80 years of mining reports and drawings of the underground workings." (A-)

3. On July 27, 2018, Ruby Hollow LLC, a Delaware limited liability company, headquartered in New York, entered into a Share Sale Agreement to purchase 61,089,050 shares of common stock of Chief ("LeadFX Shares) from LeadFX for $2.5 million. (JA – 34)

2. That Agreement provided:

Section 2.1 Sale and Purchase.

Subject to the terms and conditions of this Agreement, the Vendor hereby sells, assigns and transfers to the Purchaser and the Purchaser hereby purchases all rights and interests relating to the 2357 Canada [LeadFX] Shares, with effect as of the Closing Date.

(k) "Closing Date" means the day of Closing, which is to be 21 calendar days following the day on which the last condition precedent under this Agreement is satisfied or waived, or such later date as agreed in writing by the parties;

Section 2.1 Sale and Purchase.

Subject to the terms and conditions of this Agreement, the Vendor hereby sells, assigns and transfers to the Purchaser and the Purchaser hereby purchases all rights and interests relating to the 2357 Canada [LeadFX] Shares, with effect as of the Closing Date.

Section 2.2 Purchase Price.

15

The aggregate purchase price payable by the Purchaser to the Vendor for purchase of the 2357 Canada [LeadFX] Shares is US$2,500,000, subject to the adjustments in accordance with Section 2.4(b)(the "Purchase Price").

Section 2.3 Payment of the Purchase Price.

The Purchase Price will be paid and satisfied by the Purchaser paying to the Vendor:

(a) the First Tranche, payable on the Closing Date in accordance with Section 2.4(a);

And

(b) the Second Tranche, payable on the Deferred Payment Date in accordance with Section 2.4(b).
Section 2.4 Payment of First Tranche and Second Tranche.

(a) First Tranche

On the Closing Date, the Purchaser must pay the Vendor the sum of US$1,000,000 ("First Tranche").

(b) Second Tranche

On the Closing Date, the Purchaser will <u>assume</u> responsibility for the claims of any third party creditor of CCMC that establishes debts legally due to that creditor from CCMC (and which debt or debts were incurred by CCMC prior to the date of this Agreement and which are disclosed in Schedule A, including any interest accruing on the debt to that date) (the "Third Party Creditors") up to a total aggregate face value ofUS$1,500,000. <u>The Second Tranche of the Purchase Price will be satisfied by the Purchaser assuming and resolving the claims of the Third Party Creditors.</u> Further, the Purchaser covenants and agrees with the Vendor that, on the Deferred Payment Date, the Purchaser will pay to the Vendor an amount equal to US$1,500,000 less all amounts the Purchaser has <u>paid</u> to the Third Party Creditors in that 12 month period (the "Second Tranche"), and the Purchaser must provide

16

to the Vendor substantiation of all such amounts paid to Third Party Creditors. (emphasis supplied)

A press release by LeadFX issued on December 5, 2018, stated:

Closing will conclude today, December 5, 2018, with the payment of $1 million to LeadFX less agreed due diligence expenses of $75,000. . . . The balance of $1.5 million will continue to be due 12 months from today. (JA - 95)

The Defendants in their answer stated that the Share Sale Agreement speaks for itself.

At or about this same time, the Defendants, who had taken control of Chief, began negotiations with IG Tintic, LLC, a Delaware limited liability ("IGT"), to form a joint venture, to be known as Tintic Consolidated Metals, LLC ("TCM"). It was contemplated that Chief would contribute 14,000 acres of Chief's minerals and roughly 7,000 acres of Chief's surface rights, to TCM, in exchange for $3,500,000 of cash to Chief from IGT and a 49% interest in the joint venture. (Shareholder Update, JA - 405). From the February 2, 2019, until April 29, 2019, IGT made a series of payments to Chief, totaling $3,500,000, as part of the joint venture obligations.

In June 2019, the Defendants caused Chief to wire transfer from its funds not less than $ 942,000 to members of Ruby Hollow and its counsel. The Defendants have not presented any corporate authorization or stated corporate purpose for the transfers. (Exhibit #9 to Docket Item 74)

17

The Defendants admitted that Ruby Hollow did not assume any Chief payables or pay any Third Party Creditors as called for by the Share Sale Agreement. (JA – 318, ¶¶9 and 10)

Stanley stated that there was "no mechanism" for Ruby Hollow to assume the Third Party debts (JA 596, 601). The Defendants have not provided any evidence to show that Ruby Hollow paid any debts of Chief. The financial statements of Ruby Hollow for 2019 (JA - 422) do not show any amounts being paid by Ruby Hollow for the debts of Chief.

The payables to Third Party Creditors listed in Schedule A to the Share Sale Agreement were paid or resolved by Chief. For example, property taxes listed on Schedule A to the Share Sale Agreement were paid by Chief with funds from its mining joint venture. (. See Answer, ¶27: "admit that Chief paid property taxes that it owed to Utah County.").(JA – 163, 165)

The Defendants claim to have paid $465,674.05 FX as the remaining unpaid portion of the Second Tranche of the purchase price. At the time this was due, the Defendants caused wire transfers amounting to $850,000 from Chief to Ruby Hollow. (Exhibits ## 9 and 10 to Docket Item 74) In other words, the money came from Chief. Ruby Hollow's financial statements do not show that amount, or any similar amount, being paid from Ruby Hollow to LeadFX.

18

On July 27, 2018, Ruby Hollow also entered into a Debt Assignment Agreement with a subsidiary of LeadFX and Chief to purchase the interest of LeadFX in five loan agreements with the aggregate principal amounts of approximately $3.5 million (roughly $4 million with interest)("LeadFX Debt"). (JA – 86)

That Agreement provided:

"2. Assignment.

Assignor hereby assigns, transfers, conveys and sets over to Assignee effective as of the Closing Date the Transferred Interests to have and to hold the Transferred Interests, together with all benefit and advantage to be derived therefrom, absolutely. (emphasis supplied)

"(f) "Closing Date" means the date on which completion of the Share Sale Agreement transaction occurs, which is scheduled to be 21 calendar days following the day on which the last condition precedent under the Share Sale Agreement is satisfied or waived, or such later date as agreed in writing by the parties;

"3. Purchase Price.

"As consideration for the assignment of the Assignor's right, title and interest in and to all benefits of the Assignor under the Loan Agreements, the Assignee must pay.the Assignor the sum of US$2,000,000 ("Purchase Price") on the Closing Date and the Assignor must simultaneously remit the Purchase Price to LeadFX in full satisfaction of any amounts outstanding to LeadFX from the Assignor and the· Assignor will have no further obligations to LeadFX. The Purchase Price is to be paid by way of bank cheque or transfer to a bank account nominated by LeadFX.

"C. The Borrower (i.e. Chief) consents to the assignment, transfer and conveyance of all the right, title, estate and interests of the Assignor in

19

and to each of the Loan Agreements to the Assignee, on the terms and conditions contained herein.

"6. Borrower's Consent

The Borrower hereby consents to and acknowledges the assignment, transfer and conveyance of all the right, title, estate and interest of the Assignor to the Assignee in and to each of the Loan Agreements pursuant to this Agreement."

The Defendants have proffered a document (which they claim is confidential) dated November 30, 2018, purporting to amend the Debt Assignment Agreement. The purported amendment is not signed on behalf of LeadFX or Chief, who were both parties to the Debt Assignment Agreement. There was no corporate authorization by Chief that has been produced by the Defendants. (Exhibit #20 to Docket Item 74)

Defendant Stanley, in a declaration dated August 31, 2020, stated:

28. The revisions to the Debt Assignment Agreement were memorialized in a Letter Agreement dated November 30, 2018. Neither CCMC [Chief] nor Ropes was a party to the Letter Agreement. (JA - 382)

In other words, Chief did not consent to the revision of the Debt Assignment Agreement. At the time, the Defendants were aware that they had not raised the funds to complete acquisitions of LeadFX Shares and LeadFX Debt. (JA 440, 442))

The terms of the Share Sale Agreement and Debt Assignment Agreement were summarized in an email dated November 14, 2019, from Andrew Worland, who acted on behalf of LeadFX, to Plaintiff McGowen:

"Greg

"There are a few inaccuracies in your text message below but that aside, LeadFX signed the sale agreements in July 2018. In September 2018, the Department of Oil Gas and Mining Utah (DOGM) wrote to Chief stating that they would be increasing the bonds on one of the two permits. LeadFX as the major shareholder of Chief would ordinarily have had to fund these as Chief had no money as you know. Given the sale though, LeadFX wasn't weren't prepared to finance those bond increases ourselves.

"The new buyers agreed to fund the bond increase and LeadFX agreed to deduct it from the sales proceeds. The amount of the bond increase was US$360K. Of the US$3M due at closing, US$1M less US$7SK was received in December (December 5 news release) and the balance of US$1.64M {being US$2Mless the US$360K) was received in April 2019 (due February plus 60 days extension).

"The balance of the sales proceeds of US$1.5M was deferred for 12 months and the adjustments were to account for known liabilities that were falling due on the properties such as for instance state levied property taxes and a court lien over the properties held by Weitz that had previously prevented Chief from any "dealings on the properties. If the new buyers had to pay such amounts, they would be deducted from the final payment due.

"Kind regards

"Andrew Worland, President & CEO" (JA – 101))

The Defendants caused the $360,000 bond increase to be paid by Chief. As stated in Stanley's Declaration of August 31, 2020:

29. To fund the increased bond requirement, Ruby Hollow arranged for CCMC [Chief] to obtain a loan from CEM & Associates, LLC ("CEM"). (JA - 382)

Chief's property was mortgaged to obtain funds for the bond increase that Ruby Hollow was obligated to finance (JA – 104) Ruby Hollow did not finance the bond increase (Also see Answer, ¶28: "admit that Chief paid $360,000 it owed on a reclamation bond with DOGM").(JA – 163))

The remainder of the purchase price for the LeadFX Debt, i.e., $1.64 million, was also paid by Chief, immediately after I.G. Tintic paid $1.8 million to Chief as part of the mining joint venture.

On April 25, 2019, Defendant Stanley emailed Tom Bowen, the head of I.G. Tintic and TCM:

"On Thursday, April 25, 2019, 6:34 PM, Geoff Stanley <geoff@chiefmining.com> wrote:

"Tom,

"Chief will be using the funds from the TCM transaction to repay debt that is owed to its major shareholder, Ruby Hollow LLC and Ruby Hollow's affiliate company 321888 LLC.

"Accordingly, would you please expedite tomorrow's payment of funds directly to Ruby Hollow's account.

"I believe Doug has provided details of that account for the wire transfer. This will facilitate Chief's debt reduction and allow the proceeds to be used in accordance with the contracts to complete the LeadFX transaction.

"With thank In advance

"Geoff"

The payment from Tintic to Chief was redirected as follows:

"On Thursday, April 25, 2019, 5:40 PM, Tom Bowens <tebgeo@aol.com>

wrote:

H"i Alex and Doug (Copy Doug and Geoff from Ruby Hollow),

"Please see wire details for Ruby Hollow below. Again, it is high priority that the $1,8mm from IGD is sent through as early as possible in the morning.
Thanks,
Tom
Thomas E. Bowens, CPG
President & CEO
IG Copper Company
General Director
Kolymageo LLC
+7 962 224 2155 (Russia)
+1 360 961 0936 (International)
tebgeo (Skype)

"Begin forwarded message:

"From: Douglas Meadow douglasemeadow@gmail.com

"Date: 26 April 2019 at 08:36:08 GMT+10

"To: tebgeo@aol.com
Cc: Geoff Stanley <geoff@geoffstanley.com>, Tim Buchanan trbwater@gmail.com

"Subject: Fwd: RH wire details
Tom, please let me know that you received.

"Thank you,

23

"Douglas

"Subject: Wiring instructions for Ruby Hollow LLC

"Company address:

Ruby Hollow LLC
"150 E 69th Street, Apartment 3C,
New York City, New York 10021

"Bank address:
JPMorgan Chase
941 Lexington Ave.
NYC, NY 10021
ABA: 021000021
Account Name: Ruby Hollow LLC
Account #: 316257705
Swift code: CHASUS33

"Best regards,

:Douglas

(JA – 168)

All the funds to pay for the LeadFX Debt, assigned by LeadFX under the

Debt Assignment Agreement, came from Chief. The funds were part of the $3.5

million to be paid by the joint venture to Chief for Chief's land and mineral rights.

The Defendants argue that these funds were not Chief's funds, but rather "funds

available to Ruby Hollow." (JA - 596, ¶20)

The Defendants have not provided any evidence of corporate approval on

behalf of Chief authorizing its funds to be used for the benefit of Ruby Hollow to

24

acquire the LeadFX debt for Ruby Hollow with Chief funds. There was no corporate purpose for Chief funds to be used to acquire interests for another party, namely Ruby Hollow. The sale of Chief debt at a discount was a corporate opportunity for Chief, especially when its funds were used for the purchase.

After receipt in April 2019 of Chief funds for the purchase price of the LeadFX Debt, LeadFX issued the following press release:

> "LeadFX Reports Receives Chief Sales Proceeds
>
> "PERTH, Australia, April 29, 2019 /CNW/ - LeadFX Inc. ("LeadFX" or the "Company") (TSX: LFX) advises the next tranche of proceeds from the sale of its interests in Chief Consolidated Mining Company (refer to the Company's press release dated December 5, 2018) of US$2 million, less an increase in reclamation bonds of US$340,000, has been received.
>
> "The balance outstanding of US$1.5 million, subject to adjustments, is due on December 5, 2019. (JA – 103)

The Defendants do not deny the authenticity of the press release but claim that the terms of the Agreements were changed (perhaps unbeknownst to LeadFX) by the amendment of 11/30/18, which they wish to keep secret, and which was not signed by either LeadFX or Chief. The Defendants claimed that the other parties agreed, which is hearsay, but have provided nothing to evidence such agreement.

According to LeadFX, the "Closing Date" as defined in the Share Sale Agreement and the Debt Assignment Agreement had not yet occurred as of April 29, 2019, and Ruby Hollow did not rightfully have title to either the LeadFX

25

Shares or the LeadFX Debt. Ruby Hollow nonetheless exercised control over Chief and extracted funds from Chief for interest and principal on debt for which Ruby Hollow had not paid until it used Chief funds to pay for it. The Defendants did not provide any corporate documents evidencing how the Defendants came to control Chief, legally or otherwise.

The Defendants used Chief as a piggy bank for other Ruby Hollow obligations, as well. For example, on July 15, 2019, the Defendants caused Chief to wire transfer $225,000 to Murr Siler & Accomazzo, as attorneys for Tharp Associates, which was owed money by Ruby Hollow. There was no corporate authorization on behalf of Chief, and it was not a corporate purpose of Chief to pay obligations of Ruby Hollow. (Exhibit #14 to Docket Item 74)

Vern Tharp, a former member of Ruby Hollow, submitted a copy of an email he received from Stanley on December 19, 2019, explaining why a certain Ruby Hollow debt had not been paid.

> "OK - for clarity then I will state succinctly what must be abundantly apparent to you as a person knowledgeable of Ruby Hollow's asset base and capital structure (being a member and one who was involved in discussions regarding its formation and funding). Ruby Hollow has no source of external funding except the repayment of debt owed to it by Chief. Until Chief receives funding it cannot provide funds to Ruby Hollow that will allow it to pay off that note." (JA – 711)

Based on financial statements provided to its members (JA – 422), Ruby Hollow was thinly capitalized, and never had the wherewithal to pay the amounts it

owed for various obligations, including the purchase prices for the LeadFX Shares and LeadFX Debt (Bruderman Certification, JA – 401, ¶¶10-14(A-)).  Its attempt to raise funds for the acquisition of LeadFX Shares and LeadFX Debt was not successful (Tharp Certification, JA – 440, ¶9).  The Defendants then resorted to using Chief funds to pay for Ruby Hollow's obligations under the Share Sale Agreement and Debt Assignment Agreement.  As stated by Bruderman (JA – 701)

> In the Stanley declaration of 7/23/23, ¶10, Stanley stated, "Innumerable financing options were open to management, however we determined that there was little benefit in raising capital if it was not needed. The agreement negotiated with LeadFX, combined with Chief s ability to repay its debt following the formation of the TCM Joint Venture to develop the mineral resources, described below, mitigated the need for external financing."

> Stanley also stated in paragraph 9:

> "We arranged for investors in Ruby Hollow, and we and the investors provided the funds necessary (initially $1.2m) for potential acquisition of the LeadFX interests in Chief."

> As stated in the Bruderman Certification of 8/18/23(A-)

> "4. Clearly, from Stanley's Declaration, it was the Defendants' and Ruby Hollow's intent to use the Chief money, not Ruby Hollow's to pay Ruby Hollow's obligations to LeadFX and others. He said that Ruby Hollow did not need external financing. Yet the total purchase price for the Chief stock was $4.5 million, comprised of $2.5 million pursuant to the Share Sale Agreement and $2.0 million pursuant to the Debt Assignment Agreement - subject to certain reductions.

> "5. Ruby Hollow, with $1.2 million in cash, which appears on the Ruby Hollow financials to be loans from partners and not equity investment, did not have enough if its own funds to complete this purchase with LeadFX without outside funding. Stanley said outright

that the directors planned from the beginning to use the Chief funds earned from the TCM Joint Venture."

Bruderman is an established financial expert and professional. (Bruderman JA – 701)

The loans described by Bruderman above appear to have been repaid from Chief funds in June 2019.

In 2021, the Defendants caused Chief to issue additional shares to Ruby Hollow, members of Ruby Hollow, and other associated persons, such as Timothy Buchanan (Bruderman Declaration of 7/14/23, JA – 401, ¶¶3-9); 8/18/23, JA – 701, ¶¶8-17).

According to unsigned minutes of the Chief Board, more than 5 million shares were issued for "services" to the individual defendants themselves, Ruby Hollow members, and Timothy Buchanan, and indirect member. The issuance of such shares, and the related party nature of the transactions, was not disclosed to the Chief shareholders generally. (Exhibits 3 and 4 to McGowan Certification of 7/14/23, JA – 439) The shares were valued at $.01 per share in April 2021 and $.10 per share in September 2021, at a time when the Defendants were aware that rich gold deposits had been discovered the previous year rand when they were negotiating a price per share with Osisko Development for .57 per share.

In addition, Ruby Hollow documents furnished to its members indicate that more than 22 million additional shares were issued in conversion of Lead FX Debt for which Ruby Hollow never paid (Exhibit 6 to Bruderman Certification of 7/14/23, JA – 421)), according to the terms of a "note" that has never been disclosed to Chief's shareholders or fully described, and for which the Defendants have not presented any corporate authorization.

The Defendants' response was that Bruderman is not an expert (actually, he is – JA - 701). Moreover, it does not take an expert to recognize the difference between a valuation of $.50 and $.01 per share.

In January 2022, the Defendants entered into an agreement with Osisko Development Corp., a Canadian company, to sell Chief's ownership in TCM to Osisko for more than $60,000,000 in a combination of cash and stock, plus deferred payments, using the device of a downstream cash-out merger, after re-domesticating Chief from Arizona to Delaware. Instead of simply selling to Osisko Chief's diluted 25% ownership of TCM in a straightforward transaction (Osisko was only interested in the gold mine), the Defendants structured the transaction to spin off the remainder of Chief's assets to a new company known as Emerald Hollow, LLC, to be owned by the Defendants, and eliminate the minority interest. The Defendants were given discretion to select owners of Emerald

29

Hollow who appear, based upon the numbers involved, to be solely the members of Ruby Hollow.

## SUMMARY OF ARGUMENT

The evidence presented by the Plaintiffs was relevant, admissible, and authentic, ample, and even cumulative. It showed definitively that the Defendants did not pay for their stock interest according to the Share Sale Agreement or in connection with the secret stock grants, did not pay for debt interest according to the Debt Assignment Agreement, looted Chief, and provided false and misleading reports to Chief's shareholders.

The evidence presented by the Defendants was hearsay, irrelevant, or consisted of deceptive and unsubstantiated assertions.

Inasmuch as the Defendants' net investment to acquire Ruby Hollow's interests in Chief was effectively zero, their entitlement to the proceeds of the effective sale of Chief ought, as a matter of corporate accounting, be a similar amount, effectively zero. On the other hand, the so-called "minority" shareholders, who did invest funds in Chief, are entitled to a substantial portion, if not all, of the amounts claimed by the Defendants.

For the Defendants to achieve a return of more than $50,000,000 in exchange for little or no investment, they had to engage in a pattern of activity that

included wire, mail, and securities fraud, as well as breach of fiduciary duty,

seizure of corporate opportunities, misappropriation, and waste.

ARGUMENT

According to Rule 402 of the Federal Rules of Evidence, "(r)elevant

evidence is admissible. According to Rule 401 of the Federal Rules of Evidence,

"Evidence is relevant if:

(a) it has a tendency to make a fact more or less probable than it would without the evidence; and

(b) the fact is of consequence in determining the action.

The Plaintiffs' evidence has been authenticated either by the Plaintiffs

themselves, or by the Defendants who provided the evidence. It consists of

corporate documents, bank records, defendants' admissions, written

communications, public statements, and first-hand witness statements.

## I. The Plaintiffs' Evidence Showed That the Defendants Did Not Pay for the Stock They Claimed to Own.

Payment for Chief stock was to occur in two tranches. The first for $1

million less $75,000 for investigation expenses, the second for $1.5 million in a

year from the initial closing in December 2018. The $1.5 million obligation could

be satisfied by paying Chief's third-party debt. There is no admissible evidence

that Ruby Hollow paid any of Chief's third-party debt. The evidence shows the opposite.

The financial statements for Ruby Hollow (A-) -- which the Defendants declined to furnish, but which came from a former member of Ruby Hollow -- do not show any payments of Chief third-party debt in 2019, when the payments would have occurred.

The Defendants' answer admitted that Chief, not Ruby Hollow, paid Chief's overdue property taxes of around $360,000. Defendants' response to the Plaintiffs' request for production stated that Ruby Hollow did not assume any of Chief's third-party debt. (JA – 318)

Defendant Stanley, in an email to Vern Tharp of December 19, 2019, admitted that Ruby Hollow had no funds except what came from Chief, which Chief received from the mining joint venture. (JA - 711)

Defendant Stanley, in his opposition to Plaintiffs' motion for partial summary judgment, stated that the Defendants determined that they did not need to raise the $4.5 million need to pay for the Chief stock and debt because the Defendants could take the money from Chief. Specifically, he said:

> "…we determined that there was little benefit in raising capital if it
> was not needed. The agreement negotiated with LeadFX, combined
> with Chief s ability to repay its debt following the formation of the

TCM Joint Venture to develop the mineral resources, described below, mitigated the need for external financing." (JA – 596, ¶10)

In other words, Ruby Hollow intended to take the funds for the purchase of Chief's stock and debt from Chief.

The Defendants argued that since the third-party debts were Chief's debts, it was only natural that Chief should pay them. True enough, but then Ruby Hollow was not entitled to get a $1.5 million deduction from the $2.5 million purchase price for amounts that Chief had paid.

Stanley effectively conceded that Ruby Hollow was required to pay the second tranche when he claimed that Ruby Hollow did pay the sum of $465,674.05 in December 2019. The problem with this explanation is that, as shown by the Ruby Hollow financial statements, this money did not come from Ruby Hollow. According to the Chief Bank statements, in December 2019 and January 2020, Ruby Hollow caused Chief to pay it the sum of $850,000.(A-)

Moreover, in his Declaration, Stanley states:

"Chief settled other Potential Claims with the total payment by Chief of $1,034,325.95 to resolve Chief's Liabilities."

33

In other words, Chief, not Ruby Hollow, paid the Chief liabilities, and Ruby Hollow took credit for it.[1]

Ruby Hollow's payment of the $925,000 first tranche is also in doubt. According to Chief's bank records, in June 2019, after receiving $1 million from I.G. Tintic in connection with the mining joint venture, Chief wire transferred $942,000 to individual members of Ruby Hollow, including $245,000 to its counsel.[2]

In response to the Plaintiffs' observation that there was no corporate authorization or justification for these wire transfers, the Defendants' argued that this was merely the arguments of counsel. Any claim that the wire transfers were authorized or justified would be hearsay. At a time when the Defendants should "lay bare their proof," they have declined to provide it.

Plaintiff Robert Bruderman, a financial expert, after reviewing Ruby Hollow's financial statements, concluded that Ruby Hollow had begun existence not with equity investments but with loans from its members. (JA - 421) The close relation of the amounts of the unexplained wire transfers to the first tranche of the

---

[1] Defendants argue that LeadFX did not complain, but they declined to provide any correspondence or communications with LeadFX, so Defendants' claim is essentially hearsay.

[2] This amount does not show up as legal fees on the financial statements of either Chief or Ruby Hollow.

payment to LeadFX suggest that the wire transfers were to pay back the loans to Ruby Hollow. That is, the payments were for Ruby Hollow's debt, not Chief's.

## II. The Plaintiffs' Evidence Shows That the Defendants Did Not Pay for the Debt They Claimed to Own.

Pursuant to the Debt Assignment Agreement, Ruby Hollow had the opportunity to acquire roughly $4.5 of Chief Debt for $2 million. Credit of $360,000 was given for payment of the increase in the amount of the bond required by the Utah Department of Oil, Gas and Mining. According to Stanley, the bond increase "was funded by an additional loan to Chief." The impression Stanley gives is that the "additional loan" came from Ruby Hollow. In fact, it came from a company called C. E. Miller & Associates, and is described in the Chief's Shareholder update. (PA - 422). With respect to the C.E. Miller loan, the Update states:

> "The loans were initially drawn to deal with an unexpected increase in bonding for the mining operations following a Utah Department of Oil Gas and Mining (DOGM) review."

Chief's assets were mortgaged to raise the money to pay the bond increase, which was paid by Chief, not Ruby Hollow.

The balance of the purchase price for the debt also came from Chief. On April 25, 2019, Stanley requested that I.G. Tintic forward the amounts due to Chief as part of the joint venture, $1.8 million, be rerouted to Ruby Hollow.

Stanley argues that these funds, which were owed to Chief by the joint venture in exchange for Chief's mining assets, were not Chief's but rather "funds available to Ruby Hollow." This seems to be another way of describing trust funds that can be misappropriated. Or it could be called conversion, looting, embezzlement, or defalcation.

The apparent rationale for this heist was the claim that in December 2018, for $1.00, Ruby Hollow became instantly able to collect $4.5 million from Chief, with $2 million to be paid to LeadFX later. This rationale is based on Stanley's assertion that the Debt Assignment Agreement was amended by a letter agreement dated November 30, 2018, which Stanley states is on file with the court. (JA – 596, ¶ 19)

The problem with this rationale is that although the Debt Assignment Agreement states that all the parties, which include Chief and LeadFX, would need to agree to an amendment, the letter agreement is signed by Ruby Hollow and none of the other parties. The Defendants argue that the other parties may have agreed to the agreement other than by signing it (which is how agreement is generally demonstrated), but this is hearsay. Basically, the letter agreement appears to be no more than a counterfeit or forgery.

This raises the question of why it would be in the interest of Chief to pay LeadFX $2 million so that it could then owe Ruby Hollow another $2.5 million?

Moreover, in April 2019, when Stanley rerouted Chief's $1.8 million to pay LeadFX, Ruby Hollow did not have title to the LeadFX debt until it was paid for. This is not just bootstrapping, It is bootstrapping with someone else's boots.

Notwithstanding the absence of any justification, the debt acquired with Chief's funds was employed as a license to loot by Ruby Hollow. The incomplete bank records provided show direct transfers of $875,000 to Ruby Hollow, with more than $1 million in disbursements unexplained. (Exhibits ## 9 and 10 to Docket Item 74) Based on Chief's 2019 financial statement, there were no operations. The total for wages and salaries for the year was $46,667, all of which was paid to the corporate secretary, Tim Buchanan.

The evidence for claiming that Chief paid the price for the Chief debt comes from the Defendants. Its authenticity is not contested. It is relevant to the issue of whether Ruby Hollow paid for the Chief debt. Clearly, it did not.

## III. The Plaintiffs' Evidence Showed That the Defendants Defrauded Chief's Shareholders.

The Plaintiffs advanced a variety of theories to obtain relief for shareholders for the Defendants' activities, including breach of fiduciary duty, corporate opportunity, misappropriation, waste, securities fraud, and racketing involving wire and mail fraud in taking over an enterprise engaged in commerce and in operating an enterprise utilizing a pattern of fraudulent actions and communications.

## A.  Corporate Opportunity and Breach of Fiduciary Duty

For many years, Chief has been an Arizona corporation. Recently, the Defendants claimed that it was re-domesticated in Delaware.[3]  For legal purposes, the law of Delaware and Arizona are substantially the same with respect to the doctrine of corporate opportunity, with the courts in Arizona recognizing and following earlier Delaware precedents.

The classic statement of the doctrine of corporate opportunity is set forth in the seminal case of *Guth v. Loft, Inc.,* 23 Del.Ch. 255, 5 A.2d 503 (Del. 1939), where the Supreme Court of Delaware stated:

> "If there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which [23 Del.Ch. 273] the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired."

Fiduciary duties have also been extended to controlling shareholders. See, e.g., *Abraham v. Emerson Radio Corp*., 901 A.2d 751, 759 (Del. Ch. 2006). In this

---

[3]  If the Defendants did not rightfully own the shares they voted, the re-domestication would be void.  The Defendants refused to provide any documents, including notices to shareholders, relating to the re-domestication.

case, the individual Defendants were officers and directors[4] of Chief, and Defendant Ruby Hollow was, or purported to be, a controlling shareholder.

Guth involved that use of Loft resources to acquire an enterprise that became Pepsico.  The Delaware courts concluded that since Loft's funds and assets had been used, the enterprise rightfully belonged to Loft. In the present case, since the funds and assets to purchase the LeadFX Shares and LeadFX Debt came from Chief, those assets rightfully belong to Chief.

The principles of Guth v. Loft were recognized by the Arizona Supreme Court in Tovrea Land & Cattle Co. v. Linsenmeyer, 100 Ariz. 107, 412 P.2d 47, (Ariz. 1966).  In Tovrea, the Court found various transactions fair to the corporation. For example, the majority holder bought stock of a third party with money borrowed from the corporation, which was repaid. In the present case, the Defendants took money from the corporation, on unfair terms, and never repaid it.

Tovrea was then followed by Arizona Supreme Court in the case of Washington Nat. Trust Co. v. W. M. Dary Co., 16 Ariz. 171, 568 P.2d 1069, 1 (Ariz. 1977). In the latter case, the Court found that the conveyance of assets to the majority shareholder was patently unfair and affirmed the lower court decree ordering that title to the assets be conveyed to the corporation. In doing so the

---

[4] It is not clear how Defendants became directors of Chief.  No documentation has been provided, although it was requested.

39

Court noted that there had been no shareholder authorization or ratification of the challenged transactions.

In that case, the majority shareholder had the corporation extend a no interest loan to enable him to pursue an opportunity. In this case, the Defendants did not even borrow Chief's money, they simply took it.

In support of its decision, the District Court cited *Atkinson v. Marquart*, 112 Ariz. 304, 541 P.2d 556 (Ariz. 1975), which seems particularly inapposite. In that case, Arizona Supreme Court held:

> In Arizona a director of a corporation owes a fiduciary duty to the corporation and its stockholders. Nordin v. Kaldenbaugh, 7 Ariz.App. 9, 435 P.2d 740 (1967); Hatch v. Emery, 1 Ariz.App. 142, 400 P.2d 349 (1965); Steinfeld v. Nielsen, 15 Ariz. 424, 139 P. 879 (1913). This duty is in the nature of a trust relationship requiring a high degree of care on the part of the director. Hatch v. Emery, supra; Kenton v. Wood, 56 Ariz. 325, 107 P.2d 380 (1940); Steinfeld v. Nielsen, supra.
>
>     \*   \*   \*
>
> A review of the record discloses that there is substantial evidence to support the trial court's findings that the defendant not only engaged in a separate business of the same or substantial nature as that of the corporation in the pursuit of his own personal gain, but he also used the name, equipment, facilities and good will of the corporation for that purpose. Further, Atkinson, by his statements and acts, caused the corporation to lose business and suffer some loss of its former reputation as a shop of fine craftsmanship.

The Defendants actions, in plundering Chief to pay Ruby Hollow's obligations, and actively concealing those actions, could not be characterized as "good faith" by any stretch of imagination. A self-dealing transaction that benefits the corporate

fiduciary and provides no benefit to the corporation cannot be said to be undertaken in "good faith."

The Defendants have claimed credit for the success of Chief's joint venture partner, I.G. Tintic, which spent millions to discover "bonanza grade" gold. The Defendants' only contribution was signing a deed for Chief's mining assets to the joint venture. Chief and Ruby Hollow, which operated out of Stanley's and Meadow's apartments in New York City, had no active operations. According to the Shareholder Update (JA - 422), besides the mining, which was done by I.G. Tintic, Chief had $156,000 in land sales.

The use of Chief funds for the purchase of the LeadFX Shares should have resulted in a redemption of that stock, like a stock buy-back, either cancelling the stock of treating it as treasury stock. Either way, the purchase of the LeadFX interests by the corporation should have proportionately increased the interests of the other shareholders, most of whom presumably did pay for their stock. Determination of damages would be a simple arithmetic calculation.

LeadFX was willing to assign $3.5 principal amount of debt ($4.5 including interest) for $2 million, which was paid by Chief. Thus, it was truly a Chief corporate opportunity to reduce its debt and make the acquisition for its own account, and not for the account of a third party that was not contributing anything

to the purchase price. Applying the principle of *Guth v. Loft, supra*, as well as *Washington Nat. Trust Co., supra,* the party supplying the consideration is entitled to be the owner of the asset for which the consideration is paid.

As stated by Robert Bruderman, a credentialed financial analyst with five decades of experience in corporate finance"

> "the $2.5 million discount was a corporate opportunity- real money stolen from Chief by its directors, who are the Defendants. The discount should have been for Chiefs benefit. Instead, the transaction was engineered by the Defendants to have Chief pay Ruby Hollow the full $4.5 million in debt and interest - not discounted - thereby funding Ruby Hollow' s obligations to LeadFX under both the Share Sale Agreement and the Debt Assignment Agreement." (A-)

A comparison with Arizona's leading case, *Washington Nat. Trust Co., supra*, is instructive. In that case, the majority shareholder was ordered to forfeit his interest in a corporate opportunity when he had merely taken a no interest loan from the corporation. By contrast, the Defendants did not just steal the opportunity, they stole the ability to undertake it.

## B. Conversion and Misappropriation

The Defendants used Chief as a piggy bank. In one instance, Chief's bank records show a wire transfer made to Murr, Siler, a law firm for Vern Tharp, who was owed money by Ruby Hollow. (Exhibit #14 to Docket Item 74) Tharp was not

owed money by Chief.  As Stanley explained to Tharp, Ruby Hollow had no funds

of its own apart from what it could take from Chief.

This Murr, Siler payment is probably not a unique example.  There are more

than $1 million in disbursements from Chief's bank account for which there is no

documentation.

After the discovery of the gold "bonanza" in 2020, Chief's directors,

according to the minutes provided, determined that the fair value of Chief's shares

was $.50.  The board then determined to issue shares to the Defendants (including

the members of Ruby Hollow) priced at $.01 or $.10 per share.  The effect of these

stock grants was to dilute substantially the shareholders who had actually paid for

their shares.[5]

Further dilution occurred when Ruby Hollow exercised a right under a

"note" that has never been produced to convert a portion of the debt that Ruby

Hollow paid for with Chief funds into more than 22 million shares of stock at a

conversion price of $.10 per share, after gold was discovered by I.G. Tintic.

## C.  False and Misleading Financial Statements

Chief's shares were registered under the Securities Act of 1933.  After

Chief's management failed to file annual financial reports, the shares were

---

[5]  The Plaintiffs paid $2.00 per share more than a decade ago.

43

deregistered under Section 12(g) of the Securities Exchange Act. So long as Chief had more than 300 shareholders, it was still required under Section 15(d) of the Exchange Act to maintain accurate records and file reports. The Chief Shareholder Update, prepared by the Defendants, makes reference to applicable provisions of the Securities Act of 1933, acknowledging Chief's obligations to comply with federal securities laws.

Part of that requirement is to prepare and supply shareholders with financial statements prepared according to Generally Accepted Accounting Principles ("GAAP"). Rule S-X promulgated under the Exchange Act provides:

> "Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate …" CFR 210.4-01(a)(1)

Among the requirements of GAAP are that related party transactions be disclosed.

850-10-50-1

Financial statements shall include disclosures of material related party transactions … The disclosures shall include:

a, The nature of the relationship(s) involved

b. A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements

c. The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period

d. Amounts due from or to related parties.

as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement

None of this information is provided in Chief financial statements prepared by the Defendants.

The financial statements had other problems, such as columns not adding up, amounts not tying in from year to year, and the inconsistency between financial reports and tax returns. The statements were not audited, reviewed, or compiled. See Declaration of James Kelly. (JA – 648)

The least technical aspect of the statements -- which were not only presumptively misleading and inaccurate, but definitively misleading and inaccurate – is the failure to disclose related party transactions. The statements did not disclose that Chief funds and assets were being used to satisfy Ruby Hollow obligations. They did not reveal the direct payment to the Defendants of nearly $1 million or reveal where another $1 million unaccounted for went. They did not reveal the issuance of cheap stock for "services" that were not disclosed.

Stanley represented to the District Court that the $3.5 million received by Chief was credited the repayment of Chief's debt to Ruby Hollow. In fact, the $3.5 million was used to buy Chief's debt for Ruby Hollow, as well as pay for purchase

of Chief's stock for Ruby Hollow. Ruby Hollow never advanced money to Chief. It never paid for funds advanced to Chief. It took money from Chief.

Just as Stanley misled the District Court, the Defendants misled Chief's shareholders.

The fraudulent disclosures and non-disclosures tie directly into the Plaintiffs' racketeering claim based on a "pattern" of wire and mail fraud, obtaining money or property under false pretenses. The description of the crime accurately describes what occurred in this case. Through that pattern of fraud, the Defendants obtained control of an "enterprise," namely Chief, and conducted the business of an "enterprise," Chief again, through that pattern of lawless and fraudulent behavior.

## IV.  The Plaintiffs' Damages Can Be Easily Calculated.

The District Court ruled against the Plaintiff on the ground that damages must be shown to be caused by the breaches of fiduciary duty, citing the Arizona Appeals decision in *Amerco v. Schoen,* 907 P.2d 536, 542 (Ariz. Ct. App. 1995). In *Amerco* the issue was whether nominal damages could be awarded where there were no actual damages. It is a stretch to apply that ruling to this case.

Here there are actual damages. The Defendants obtained roughly 90% of the stock of Chief for nothing. If that interest is cancelled, as it lawfully should be, then the Plaintiffs' interest would be increased by a factor of 10, and its damages would be nine times what they received because of the Osisko acquisition.

The damages would arguably be greater because the Defendants misused the funds received from the joint venture that could have been invested in the venture, making Chief's interest 20% greater.

Then there all the funds siphoned from Chief by the Defendants, some of which are yet to be accounted for, and the value of assets transferred to Emerald Hollow.

To assume that the Plaintiffs and other shareholders were not seriously damaged by the Defendants fraudulent conduct is to turn a blind eye to the wrongdoing that obviously occurred.

## V.  Summary Judgment Should Not Have Been Granted to the Defendants.

In *Gallo v. Prudential Residential Services Ltd. Partnership,* 22 F.3d 2219, 2223-4, the Court of Appeals stated:

> Considering how often we must reverse a grant of summary judgment, the rules for when this provisional remedy may be used apparently need to be repeated. First, summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. [Citation Omitted]. In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. [Citations Omitted]. Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. [Citations Omitted]. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no

47

genuine issue of material fact and a grant of summary judgment is proper. [Citations Omitted]

There are at least issues of fact in the case whether the Defendants paid for their interests in the stock and debt or whether they fully disclosed all the material related party transactions. In view of the Defendants' obstruction and concealment during discovery, the Court should not be unmindful of Rule 56(d)

The Plaintiffs contend that there is absolute certainty that the Defendants did not pay for their interests and concealed related party transactions, and that the admissible evidence clearly establishes that the Defendants stole their interests and concealed their blatant looting of a public corporation.

## CONCLUSION

The District Court erred in concluding that the Plaintiffs had submitted no admissible evidence to support their claims. Not only is the evidence relevant, admissible, and authentic, on most issues it is either overwhelming or unrebutted by admissible evidence.

The Decision and Order of the District Court should be reversed.

Respectfully submitted,

Solomon Blum Heymann LLP
Attorneys for Plaintiffs

By /s/ Ambrose Madison Richardson
Ambrose Madison Richardson (AR-0704)
40 Wall St., 35th Flr., NY, NY 10005
(212) 267-7600: arichardson@solblum.com

February 2, 2024

48

CERTIFICATE OF COMPLIANCE

The undersigned hereby confirms that the foregoing brief, including this certificate, complies with Appellate Rule 32(a)(7)(B)(i), and that the word count according to MS Word is 10,859.

Solomon Blum Heymann LLP
Attorneys for Plaintiffs

By /s/ Ambrose Madison Richardson
Ambrose Madison Richardson (AR-0704)
40 Wall St., 35th Floor
New York, NY 10005
(212) 267-7600; arichardson@solblum.com

February 2, 2024

# SPECIAL APPENDIX

i

# Table of Contents

**Page**

Opinion and Order of Honorable Denise Cote,
    Dated October 12, 2023 ............................................................SPA-1

Judgment of The United States District Court Southern
    District of New York, Dated October 12, 2023,
    with Attachments .....................................................................SPA-17

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------- X
                                :
GREGORY MCGOWAN, et al.,        :        22cv6971 (DLC)
                                :
                  Plaintiffs,   :
        -v-                     :        OPINION AND ORDER
                                :
GEOFF STANLEY, et al.,          :
                                :
                  Defendants.   :
                                :
------------------------------- X

APPEARANCES:

For the plaintiffs:
A.M. Richardson, P.C.
Ambrose Madison Richardson, III
40 Wall Street, 35ᵗʰ Floor
New York, NY 10005

For the defendants:
Parr Brown Gee & Loveless
Matthew J. Ball
101 South 200 East, Suite 700
Salt Lake City, UT 84111


DENISE COTE, District Judge:

    Plaintiffs were once minority shareholders of Chief

Consolidated Mining Company ("Chief").  In 2022, they sold their

shares during a corporate buyout.  They have brought suit

against Ruby Hollow LLC ("Ruby Hollow"), which once owned a

majority interest in Chief, and two of its managers.  Plaintiffs

assert that Ruby Hollow improperly used Chief's assets to

acquire its shares and that it structured subsequent

transactions for the personal benefit of defendants.

SPA-2

Defendants have moved for summary judgment dismissing plaintiffs' claims in their entirety.  Plaintiffs have moved for partial summary judgment on their claim for breach of fiduciary duty.  The plaintiffs largely declined to participate in discovery and have not offered admissible evidence sufficient to defeat the defendants' motion or to support their own motion. For the following reasons, defendants' motion is granted, and plaintiffs' motion is denied.

## BACKGROUND

I.   2018 Ruby Hollow and LeadFX Transactions

Chief, a mining company with assets in Utah and Arizona, was founded over a century ago and was publicly traded until 2011, when the SEC revoked its registration.  It thereafter filed for bankruptcy.  In 2015, a subsidiary of LeadFX, Inc. ("LeadFX") purchased the majority interest in Chief.

In 2018, Ruby Hollow and LeadFX entered into agreements (the "Share Sale Agreement" and the "Debt Assignment Agreement") whereby Ruby Hollow would acquire the majority interest in Chief, as well as certain of Chief's debts to LeadFX and to third party creditors.  At the time, Chief had approximately $6 million in debt, including over $4 million in debt to LeadFX; was delinquent on taxes and bond requirements; and had not had any active mining operations for over a decade.

2

SPA-3

The Share Sale Agreement

The Share Sale Agreement provided for an aggregate purchase price of $2.5 million, to be divided into two "tranches."  The first tranche was a payment of $1 million, due on December 4, 2018, and not subject to any offsets.  The second tranche, representing the remaining balance of the aggregate purchase price for LeadFX's shares in Chief, was to be satisfied by Ruby Hollow assuming and resolving the claims of third-party creditors of Chief, up to a total of $1.5 million.  Ruby Hollow agreed to assume responsibility for the claims of third-party creditors on the closing date (December 4, 2018); then, on December 4, 2019, Ruby Hollow would pay LeadFX an amount equal to $1.5 million less all amounts Ruby Hollow had paid to third party creditors in that twelve-month period.

Because the contract was between LeadFX and Ruby Hollow only -- that is, Chief was not a party to it -- it did not create a legal obligation on the part of Ruby Hollow to satisfy Chief's debts.  Instead, it created a means by which the parties to the contract (LeadFX and Ruby Hollow) could agree on a purchase price for LeadFX's shares given the uncertain impact of Chief's liabilities on its value.  Ruby Hollow, as the controlling shareholder, risked losing all or a portion of the value of its investment in Chief if Chief's debts turned out to be enforceable; thus, the Share Sale Agreement provided a

3

SPA-4

mechanism for the purchase price to reflect the value of the shares.

### The Debt Assignment Agreement

Pursuant to the Debt Assignment Agreement, LeadFX assigned to Ruby Hollow its interest in the more than $4 million in debt owed to it by Chief. Ruby Hollow agreed to pay $2 million for the assignment of the debt; this discounted price accounted for the risk that Chief would default on the debt or be forced into bankruptcy by a third-party creditor.

In November 2018, LeadFX and Ruby Hollow agreed to modify the terms of the Debt Assignment Agreement after due diligence investigations revealed additional liabilities on the part of Chief. The purchase price of the Debt Assignment Agreement was reduced accordingly.

II. Defendants' Management of Chief

After the closing date of the Share Sale Agreement, defendants Douglas Meadow and Geoff Stanley were appointed to Chief's Board of Directors. Chief's management, including Meadow and Stanley, evaluated options for improving Chief's financial status; Meadow and Stanley could have foreclosed on Chief's debt to Ruby Hollow but instead pursued other options for increasing Chief's value.

Throughout 2019, Chief's management prioritized resolving Chief's debts. On occasion, Ruby Hollow loaned funds to Chief

SPA-5

so it could satisfy its obligations.  At other times, Chief made
payments to third parties on debts held by Ruby Hollow;
equivalent amounts were then deducted from the debt owed by
Chief to Ruby Hollow.

### Joint Venture

In 2019, Chief entered into a joint venture with IG Global
("IG").  The joint venture operated under a new entity called
Tintic Consolidated Metals, LLC ("TCM").  The transaction was
structured as follows: IG paid $1.2 million to Chief and assumed
Chief's obligations under a $2.3 million loan; in exchange,
Chief transferred some of its property to TCM.  TCM was
contractually obligated to fund mineral exploration of the
property, and Chief paid off most of its third-party creditors.
As a result, Chief's value improved.

### Osisko Transaction

In 2022, Osisko Development Corporation ("Osisko") acquired
Chief.  Chief was merged into Osisko and no longer exists.

As part of the Osisko Transaction, Chief's minority
shareholders, including plaintiffs, were given the choice of
selling their Chief shares at $.58 per share or rolling their
shares into a membership interest in Emerald Hollow, LLC, which
in turn owned shares in Osisko.  The last arms-length trade of
Chief shares prior to Ruby Hollow's involvement in 2018 had been
at $0.01 per share.  Plaintiffs, who had purchased their shares

in 2001 and 2002, chose to take the $0.58 per share buyout.
Plaintiffs did not dissent from the merger.  After the closing
of the Osisko Transaction in May 2022, defendants had no further
affiliation or employment with either Chief or Osisko.

## PROCEDURAL HISTORY

On August 16, 2022, the plaintiffs filed a class action
complaint alleging that the defendants breached their fiduciary
duties to Chief shareholders, violated § 10b of the Securities
Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), SEC
Rule 10b-5, 17 C.F.R. § 240.10b-5, and violated the Racketeer
Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§
1962(b),(c).  The essence of plaintiffs' claims is that the
defendants improperly used Chief's assets, instead of their own,
to satisfy Chief's debts and acquire a majority interest in
Chief, then managed Chief so as to further their own interests
at the expense of minority shareholders.

An initial pretrial conference was held on November 21.
After inquiry from the Court, the plaintiffs stated that they
had not published any notice of the putative class action as
required by the Private Securities Litigation Reform Act.  See
15 U.S.C. § 78u-4(a)(3)(A)(i).  The Court advised plaintiffs'
counsel that unless the plaintiffs promptly published a notice,
the class claims under § 10(b) of the Exchange Act would be

dismissed.  Plaintiffs never advised the Court that they had
published the requisite notice.

A Pretrial Scheduling Order of November 21 set forth the
deadlines governing discovery and motion practice for class
certification and summary judgment.  All fact discovery was to
be completed by May 26, 2023, and all expert discovery was to be
completed by August 25, 2023.

On January 13, 2023, the plaintiffs moved to disqualify
defendants' counsel.  The motion was denied on February 17.
McGowan v. Stanley, No. 22cv6971 (DLC), 2023 WL 2118084
(S.D.N.Y. Feb. 17, 2023).

On February 1, a settlement conference was scheduled for
April 26.  On April 24, two days prior to the scheduled
settlement conference, plaintiffs' counsel requested an
adjournment.  Magistrate Judge Katharine Parker scheduled a
telephone conference for April 25 to discuss the adjournment,
and plaintiffs' counsel failed to appear.  The plaintiffs and
their counsel also failed to appear at duly noticed depositions
of the plaintiffs that the defendants had scheduled in New York
for the two days before the settlement conference, after
plaintiffs' counsel had failed to respond to their requests to
schedule the depositions but had suggested the week of the
settlement conference.  On May 2, the defendants moved for

sanctions against the plaintiffs for their failure to appear at
the settlement conference.

Plaintiffs had moved for class certification on April 14.
At a May 17, 2023 conference, held on the record, the Court
denied the motion for class certification and granted the
defendants' motion for sanctions.  At that conference and in
their motion papers, the defendants raised numerous discovery
issues.  The defendants advised the Court that they had sent a
proposed protective order to the plaintiffs in December 2022,
and to date, plaintiffs' counsel had not responded with any
proposed revisions and instead only objected to the proposed
protective order in April 2023.  Due to this delay, the
defendants had not been able to share discovery with the
plaintiffs.  Plaintiffs' counsel had also failed to respond to
the defendants' multiple requests to schedule depositions of the
individual plaintiffs.

The Court ordered plaintiffs' counsel to promptly respond
to the defendants' proposed protective order so that the
protective order could be entered that week.  The Court also
ordered the plaintiffs to make themselves available for
depositions in New York by May 26, the close of fact discovery.
At the conference, for the first time, plaintiffs' counsel
requested depositions of the defendants.  Defense counsel agreed

to schedule those depositions.  Plaintiffs' counsel also stated
that the plaintiffs would be filing an expert report on June 16.
The protective order was entered on May 19.

On June 16, the day on which the plaintiffs were required
to serve their expert report on the defendants, the plaintiffs
requested a 60-day extension of all pending deadlines, citing
the plaintiffs' desire to change counsel.  The request was
denied that same day, and, given the lack of expert discovery,
the briefing schedule for any motion for summary judgment was
moved up such that the motion was due July 14.  On July 12, the
defendants moved for summary judgment seeking dismissal with
prejudice of all five of plaintiffs' claims.  On July 14, the
plaintiffs moved for partial summary judgment on their claim
that defendants breached their fiduciary duty by appropriating
Chief's funds and assets to acquire the majority interest.  Both
motions were fully submitted on August 18.

## DISCUSSION

I.   Summary Judgment Standard

Summary judgment may be granted only when "the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  "To present a genuine issue of material fact
sufficient to defeat a motion for summary judgment, the record

9

must contain contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party." Horror Inc. v. Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are facts that "might affect the outcome of the suit under the governing law." Choi v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d. Cir 2021) (citation omitted).  In considering a motion for summary judgment, a court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Kee v. City of New York, 12 F.4th 150, 159 (2d Cir. 2021) (citation omitted).

Although the movant bears the initial burden of showing that there is no genuine dispute as to a material fact, when "the burden of proof at trial would fall on the nonmoving party, the moving party can shift the initial burden by pointing to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." McKinney v. City of Middletown, 49 F.4th 730, 738 (2d Cir. 2022) (citation omitted). If the moving party carries its burden, the nonmoving party must "come forward with evidence that would be sufficient to support a jury verdict in its favor." Id. (citation omitted).  Rather than merely "deny the moving party's allegations in a general way," the party opposing summary judgment "must present

competent evidence that creates a genuine issue of material
fact." Id. (citation omitted).  Unsupported allegations do not
create a material issue of fact.  Id.

Local Rule 56.1, which codifies the above burden-
shifting scheme and was "adopted to aid the courts in
deciding summary judgment motions by quickly identifying
disputed material facts," requires that

> any motion for summary judgment be accompanied by a
> list of the material facts as to which the moving
> party contends there is no genuine issue to be tried .
> . . .  Should the nonmoving party wish to contest the
> assertions contained within a Rule 56.1 statement, the
> nonmoving party must respond to each of the
> statement's paragraphs and include, if necessary, a
> statement of the additional material facts that
> demonstrate a genuine issue for trial.  A nonmoving
> party's failure to respond to a Rule 56. 1 statement
> permits the court to conclude that the facts asserted
> in the statement are uncontested and admissible.

T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 417-18 (2d
Cir. 2009) (citation omitted).

Local Rule 56.1(c) provides that "[e]ach numbered
paragraph in the statement of material facts set forth in
the statement required to be served by the moving party
will be deemed to be admitted for purposes of the motion
unless specifically controverted by a correspondingly
numbered paragraph in the statement required to be served
by the opposing party."  Rule 56.1(d) further requires that
each statement by the movant or opponent in the Rule 56.1

SPA-12

statements "including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible" under Fed. R. Civ. P. 56(c).

As explained below, defendants adequately shifted their burden as movants for summary judgment by pointing to a lack of admissible evidence to prove every element of plaintiffs' claims.  Plaintiffs, in responding to defendants' Rule 56.1 statement, raised no material issue of fact.  Instead, plaintiffs' response consists of conclusory arguments and citations to the pleadings, none of which constitutes admissible evidence.  Defendants' motion for summary judgment is therefore granted in its entirety.  Plaintiffs' motion for partial summary judgment is denied.

II.   First and Second Claims: Breach of Fiduciary Duty
      (Corporate Opportunity, Waste and Misappropriation)

Federal courts apply the choice-of-law rules of the state in which they sit.  Under New York's choice-of-law rules, the law of the state of incorporation governs an allegation of breach of fiduciary duty owed a corporation.  See Pereira v. Farace, 413 F.3d 330, 341 (applying Delaware law to breach of fiduciary duty claim involving Delaware corporation); see also Walton v. Morgan Stanley & Co. Inc., 623 F.2d 796 (2d Cir. 1980).  Chief was an Arizona corporation, and plaintiffs claim

12

that defendants breached the fiduciary duties they owed as
officers of Chief.  Therefore, Arizona law governs the breach of
fiduciary duty claims.

Plaintiffs assert two claims for breach of fiduciary duty,
both of which rely on plaintiffs' theory that defendants
improperly used Chief's own assets to purchase their majority
interest in Chief from LeadFX.  Arizona courts have "recognized
the general rule that a director does not breach his fiduciary
duty so long as he acts honestly and in good faith and breaches
no specific duty owing to the corporation."  Atkinson v
Marquart, 541 P.2d 556, 558 (Ariz. 1975).  Plaintiffs bear the
burden of proving causation and the amount of damages in a claim
for breach of corporate fiduciary duty.  AMERCO v. Shoen, 907
P.2d 536, 542 (Ariz. Ct. App. 1995).  Although as a general rule
"uncertainty as to amount of damages will not preclude recovery"
once the right to damages has been established, Arizona law
requires "a reasonable basis in evidence for the tier of fact to
fix compensation when a dollar loss is claimed."  Nelson v.
Cail, 583 P.3d 1384, 1387 (Ariz. Ct. App. 1978).

Defendants' Rule 56.1 statement noted that plaintiffs have
submitted no admissible evidence that defendants breached their
fiduciary duty to plaintiffs.  Plaintiffs, in response, provided
no admissible evidence of any instance in which defendants used

13

Chief's assets to satisfy a debt or obligations of defendants or engaged in improper self-dealing.  Because in this case the "the burden of proof at trial would fall on the [plaintiffs], the [defendants] can shift the initial burden by pointing to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  McKinney, 49 F.4th at 738 (citation omitted).  Defendants did just that: in their Rule 56.1 Statement, defendants pointed to the lack of evidence of breach, an essential element of plaintiffs' claim, thus shifting the initial burden to plaintiffs.  Plaintiffs cited no admissible evidence in their response.

III. Third Claim: Securities Fraud (Exchange Act and Rule 10b-5)

Plaintiffs' third claim alleges that defendants' acquisition of Chief stock and debt was done as a scheme to defraud Chief shareholders, in violation of the Exchange Act. To recover damages in a private securities-fraud action under § 10(b) of the Exchange Act, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  See CAMCO Investors, Inc. v. Vivendi Universal, S.A., 838 F.3d 214, 217 (2d Cir. 2016).

14

Defendants in their Rule 56.1 Statement pointed to the lack
of any evidence of any instance of defendants making any "untrue
statement of a material fact or omit[ting] to state a material
fact necessary in order to make the statements made, in the
light of the circumstances under which they were made, not
misleading," as that phrase is used in SEC Rule 10b-5.
Plaintiffs again cited no admissible evidence in response.

IV.  Fourth and Fifth Claims (RICO 18 U.S.C. § 1962(b) and (c))

To establish a RICO claim, a civil plaintiff must show (1)
a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury
to business or property; and (3) that the injury was proximately
caused by the violation of Section 1962.  See D'Addario v.
D'Addario, 901 F.3d 80, 96 (2d Cir. 2018).  To establish a
substantive RICO violation, a plaintiff must show "a pattern of
racketeering activity."  18 U.S.C. § 1962(a)-(c).

Plaintiffs allege that defendants engaged in a pattern of
mail and wire fraud to misappropriate and transfer Chief funds
and obtain Chief's assets under false pretenses.  Once again,
plaintiffs have pointed to no admissible evidence of any
instance of misappropriation of Chief's assets by defendants.
Nor have they provided admissible evidence of any
misrepresentation or omission by defendants in connection with
defendants' acquisition of shares or debt.

SPA-16

## CONCLUSION

The defendants' July 12, 2023 motion for summary judgment is granted. The plaintiffs' July 12, 2023 motion for partial summary judgment is denied.

The Clerk of Court shall enter judgment for the defendants and close the case.

Dated:     New York, New York
           October 12, 2023

                                    _____
                                    DENISE COTE
                                    United States District Judge

SPA-17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
GREGORY MCGOWAN, et al.,

                              Plaintiffs,

          -against-                                        22 **CIVIL** 6971 (DLC)

                                                          **JUDGMENT**

GEOFF STANLEY, et al.,

                              Defendants.
-------------------------------------------------------------------X


          It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated October 12, 2023, the defendants' July 12, 2023

motion for summary judgment is granted. The plaintiffs' July 12, 2023 motion for partial

summary judgment is denied; accordingly, the case is closed.

**Dated:**  New York, New York

          October 12, 2023


                                                **RUBY J. KRAJICK**
                                         _____
                                                **Clerk of Court**

                              **BY:**        K. Mango
                                         _____
                                                **Deputy Clerk**

SPA-18



**United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted*. If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/.**

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

SPA-19

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (      )(      )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: _____

_____

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the    ☐ judgment    ☐ order    entered on: _____

(date that judgment or order was entered on docket)

that: _____

_____

(If the appeal is from an order, provide a brief description above of the decision in the order.)

_____          _____

Dated                                                    Signature*

_____

Name (Last, First, MI)

_____

Address                         City                    State                    Zip Code

_____          _____

Telephone Number                                  E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

SPA-20

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____          _____CV_____ (      )(      )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-                    **MOTION FOR EXTENSION
OF TIME TO FILE NOTICE
OF APPEAL**

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time

to file a notice of appeal in this action. I would like to appeal the judgment

entered in this action on _____ but did not file a notice of appeal within the required
                                date

time period because:

_____

_____

_____
(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)

_____          _____
Dated:                                   Signature

_____
Name (Last, First, MI)

_____
Address                        City            State            Zip Code

_____          _____
Telephone Number                         E-mail Address (if available)

Rev. 3/27/15

SPA-21

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (      )(      )

**MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma pauperis* on appeal. This motion is supported by the attached affidavit.

_____
Dated

_____
Signature

_____
Name (Last, First, MI)

_____  _____  _____  _____
Address                          City    State                            Zip Code

_____
Telephone Number

_____
E-mail Address (if available)

Rev. 12/23/13

SPA-22

Case 1:22-cv-06971-DLC   Document 100-1   Filed 10/12/23   Page 5 of 10

## Application to Appeal In Forma Pauperis

_____ **v.** _____   Appeal No. _____

District Court or Agency No. _____

| Affidavit in Support of Motion | Instructions |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)<br><br>Signed: _____ | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.<br><br>Date: _____ |

My issues on appeal are: (<u>required</u>):

1.   *For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

SPA-23

| | | | | |
|---|---|---|---|---|
| Interest and dividends | $ | $ | $ | $ |
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | $ 0 | $ 0 | $ 0 | $ 0 |

2.    *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.    *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

SPA-24

4.   *How much cash do you and your spouse have? $* _____

*Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

***If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.***

5.   *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| | | Make and year: |
| | | Model: |
| | | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: | | |
| Model: | | |
| Registration #: | | |

SPA-25

6.  *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

7.  *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
| | | |
| | | |
| | | |

8.  *Estimate the average monthly expenses of you and your family.  Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>    Are real estate taxes included?  ☐ Yes  ☐ No<br>    Is property insurance included?  ☐ Yes  ☐ No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

SPA-26

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
|     Homeowner's or renter's: | $ | $ |
|     Life: | $ | $ |
|     Health: | $ | $ |
|     Motor vehicle: | $ | $ |
|     Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
|     Motor Vehicle: | $ | $ |
|     Credit card (name): | $ | $ |
|     Department store (name): | $ | $ |
|     Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | $ 0 | $ 0 |

9.  *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

☐ Yes    ☐ No    If yes, describe on an attached sheet.

10. *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* ☐ Yes ☐ No

    *If yes, how much?* $ _____

SPA-27

11.     *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.     *Identify the city and state of your legal residence.*

City _____   State _____

Your daytime phone number: _____

Your age: _____   Your years of schooling: _____

Last four digits of your social-security number: _____